IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHIONOGI PHARMA, INC., et al. | : CIVIL ACTION |
| v. | : |
| MYLAN, INC. et al. | : NO. 10-1077 |

## MEMORANDUM RE: MOTION TO DISMISS COUNTERCLAIM

Baylson, J.                                                                                                                         June 10, 2011

### I. Introduction

Presently before the Court in this patent-infringement lawsuit is the Motion of Plaintiffs-Counter-Defendants Shionogi Pharma, Inc. ("Shionogi") and CIMA Labs Inc. ("CIMA") to Dismiss Counts 3 and 4 of the Counterclaim filed by Defendant-Counter-Plaintiff Mylan Pharmaceuticals Inc. ("Mylan") for failure to state a claim upon which relief can be granted. Mylan has asserted counterclaims against Shionogi and CIMA (collectively, "the Counter-Defendants") pursuant to the Sherman Act, 15 U.S.C. § 1 et seq., for monopolization and attempted monopolization (Count 3) and combination and conspiracy in restraint of trade.[1]

Mylan has not pleaded its antitrust counterclaims with the specificity required by the Supreme Court's Twombly and Iqbal decisions. Therefore, the Motion is granted and Counts 3 and 4 of the Counterclaim are dismissed with leave to amend.

### II. Factual and Procedural History

On May 25, 2004, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 6,740,341 B1 ("the '341 patent"), titled "Taste Masking Rapid Release Coating

---

[1] Mylan also counterclaims for a declaratory judgment of non-infringement (Count 1) and patent invalidity (Count 2). The Counter-Defendants have not moved to dismiss these claims.

System." Compl. ¶ 13; Countercl. ¶ 11. The '341 patent relates to the structure of a tablet that masks the ill-taste of a pharmaceutical. Countercl. ¶ 13. CIMA is the owner by assignment of the '341 patent. Compl. ¶ 13; see Countercl. ¶ 12. Shionogi is an exclusive licensee of the '341 patent in the United States with regard to orally disintegrating tablets containing prednisolone sodium phosphate, prednisolone, or any salt or base thereof. Compl. ¶ 13; see Countercl. ¶ 12. Shionogi holds New Drug Application ("NDA") No. 021959 for 10 mg, 15 mg, and 30 mg prednisolone sodium phosphate orally disintegrating tablets, which Shionogi markets in the United States as Orapred ODT®. Compl. ¶ 14; see Countercl. ¶ 18.

Mylan submitted Abbreviated New Drug Application ("ANDA") No. 202-179 for 10 mg, 15 mg, and 30mg prednisolone phosphate orally disintegrating tablets ("Proposed Product") to the Food and Drug Administration ("FDA"). Compl. ¶ 15; Countercl. ¶ 21. Mylan notified the Counter-Defendants of the ANDA and certified that its Proposed Product, which has no "spacing layer," did not infringe the '341 patent, which excludes tablets without a "spacing layer." Countercl. ¶¶ 24-25, 44. The Counter-Defendants accepted Mylan's Offer of Confidential Access and received the ANDA and samples of the Proposed Product. Countercl. ¶¶ 26-27.

On December 9, 2010, Counter-Defendants filed a Complaint (ECF No. 1) against Mylan Inc. and Mylan Pharmaceuticals Inc. for infringement of the '341 patent.[2] On January 18, 2011, Mylan filed its Answer and Counterclaims. (ECF No. 13) On February 25, 2011, Counter-Defendants filed this Motion to Dismiss and accompanying brief. (ECF No. 20/21) Mylan responded on March 29, 2011 (ECF No. 29) and Counter-Defendants replied on April 8, 2011.

---

[2] On January 28, 2011, the Court granted the stipulation of dismissal of Mylan Inc. (ECF No. 16)

(ECF No. 35)

### III. The Parties' Contentions

#### A. Shionogi and CIMA's Contentions

First, Counter-Defendants contend that Mylan lacks standing to bring an antitrust claim, because Mylan is not a purchaser, seller, or competitor in the relevant market, and did not allege an antitrust injury. Second, Counter-Defendants argue that Mylan's allegations are conclusory and insufficient to allege a relevant product market, geographic market, or market power. Third, Counter-Defendants contend that Mylan has not alleged sham enforcement of their patent rights, and that enforcing patent rights is not monopolistic conduct. Fourth, Counter-Defendants assert that Mylan has not alleged a conspiracy or combination in restraint of trade, because Shionogi, as an exclusive licensee, had to join CIMA, the patent holder, in its infringement suit.

#### B. Mylan's Contentions

Mylan responds that it has standing as a competitor who shows intention to enter the market and preparedness to do so. Mylan contends that its antitrust injury is its litigation costs and the costs of delaying Mylan's entry into the market.

With respect to the merits, Mylan contends that it alleged the relevant market is orally disintegrating prednisolone tablets, the geographic market is the United States, and that Counter-Defendants have market power. Mylan asserts that the Counter-Defendants have no reasonable basis for asserting the enforceability of the '341 patent, are aware the Proposed Product is non-infringing, and filed a baseless suit to exclude Mylan from entering the market. Additionally, Mylan contends that it alleged a conspiracy or combination when the Counter-Defendants agreed to engage in coordinated activity to delay FDA approval of the Proposed Product.

## IV. Legal Standard

### A. Jurisdiction

The District Court has jurisdiction over the patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a). The District Court has jurisdiction over the Sherman Act counterclaims under 28 U.S.C. §§ 1331 and 1337(a).

### B. Motion to Dismiss

When deciding the motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court limits its review to the face of the counterclaim. Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 835 (3d Cir. 2011). The Court must accept as true all well-pleaded factual allegations and must construe them in the light most favorable to the non-moving party. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Third Circuit has addressed the effect of the Supreme Court's most recent pleading-standard decisions, Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). See Phillips, 515 F.3d at 233–34. Twombly established a three-pronged approach for all civil actions: first, the court must identify the elements Plaintiff must plead to state a claim; second, the court asks whether the complaint sets forth factual allegations or conclusory statements; third, if the complaint sets forth factual allegations, the court must assume their veracity and draw reasonable inferences in favor of the non-moving party, but then must determine whether the factual allegations plausibly give rise to an entitlement to relief. Santiago v. Warminster Twp., 629 F.3d 121, 130 & n. 7 (3d Cir. 2010); see Iqbal, 129 S. Ct. at 1950,

4

1953. For the second step, the court should separate the factual and legal elements of the claims, must accept the well-pleaded facts as true, and may disregard any legal conclusions. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009).

The undersigned, formerly a member of the Advisory Committee on Civil Rules, knows that many practitioners and judges share in the confusion resulting from Iqbal's seemingly strong requirement of factual pleadings in the absence of any specific overruling of prior cases allowing traditional notice pleading. The Court concludes that notice pleading is still the rule, because Rule 8 is still in effect, but that the concept of notice pleading has changed and must be accompanied by either factual or legal assertions satisfying the elements of the claims made. See Phillips, 515 F.3d at 234. In other words, "notice pleading" now requires "notice" of at least those facts necessary to raise an inference that the defendant has stated a counterclaim. See id. at 234–35 (concluding Rule 8 requires "some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation").

Nevertheless, it is "true that judging the sufficiency of a pleading is a context-dependent exercise. Some claims require more factual explication than others to state a plausible claim for relief." W. Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010) (reversing district court's application of heightened scrutiny in antitrust context) (citations omitted). Thus, pleading a civil rights claim may require fewer factual allegations than pleading an antitrust conspiracy or other complex business dispute. Cf id. (suggesting a claim for simple assault may require fewer factual allegations than a claim for an antitrust conspiracy).

To state a claim, a plaintiff must allege circumstances with enough factual matter to suggest the required claim exists. Phillips, 515 F.3d at 234. This does not impose a probability

requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims, Iqbal, 129 S. Ct. at 1949; Phillips, 515 F.3d at 234. "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to reasonably infer that the defendant is liable for the misconduct alleged.'" Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949).

## V.  Discussion

Initially, the parties dispute whether Mylan has "antitrust standing" to raise its claims under the Sherman Act. Antitrust standing is a prudential, rather than a constitutional, limitation on the district court's jurisdiction. City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998).[3] Because prudential standing requirements are not imposed by Article III of

---

[3] The Third Circuit examines five factors to determine whether a claimant has antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;
> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;
> (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;
> (4) the existence of more direct victims of the alleged antitrust violations; and
> (5) the potential for duplicative recovery or complex apportionment of damages.

Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 320 (3d Cir. 2007) (quoting Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997)) (holding that the plaintiff participant in the market lacked standing to assert a monopoly maintenance claim where the complaint contained insufficient factual allegations that the defendant intended to cause any harm to plaintiff in the relevant product markets; the causal connection was "highly speculative;" the injury to the plaintiff was "extremely remote"; and direct competitors in the market could assert antitrust claims against the plaintiff). The second element is the "antitrust injury"

the Constitution, the Court need not decide now whether Mylan has antitrust standing, because its antitrust counterclaims are insufficient to state a claim. See Interactive Media Entm't & Gaming Ass'n v. Attorney Gen. of U.S., 580 F.3d 113, 118 (3d Cir. 2009) (assuming without deciding that a third party satisfied prudential standing requirements where the party's claim "clearly fail[ed] on the merits," and affirming dismissal of the complaint). Here, even assuming that Mylan has standing, Mylan's thin factual allegations do not support its antitrust counterclaims.[4]

### A. Count Four: Sherman Act, Section 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (2010). Courts construe Section 1 as prohibiting "only unreasonable restraints of trade." W. Penn Allegheny Health Sys., 627 F.3d at 99 (citing Standard Oil Co. v. United States, 221 U.S. 1, 58 (1911); United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993)).

To plead a Section 1 claim under the Sherman Act, a complaint "must allege four elements: '(1) concerted action by the defendants; [(2)] that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'" Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 253 (3d Cir. 2010) (citing Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005)). A claim pursuant to Section 1 "require[s] the existence of an agreement." Id. at 254 (citing In re Ins. Brokerage Antitrust Litig., 579 F.3d

---

requirement. Id.

[4]The Court reserves decision on the issue of standing until Mylan has amended its counterclaims.

241, 267 (3d Cir. 2009)). To establish an agreement, the claimant "must allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" Id. (quoting Copperweld Corp. v. Ind. Tube Corp., 467 U.S. 752, 771 (1984)).

The Supreme Court held in Twombly that stating a claim under § 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Id. The complaint in Twombly did not satisfy the pleading standards because the plaintiffs based their Section 1 claim "on descriptions of parallel conduct and not on any independent allegation of actual agreement." Id. at 564. A "fair reading" of the statements in the complaint that "sp[oke] directly of agreement" showed they were "merely legal conclusions resting on the prior allegations." Id.

The Third Circuit interpreted Twombly in Howard Hess, which affirmed the dismissal of a Section 1 claim where the plaintiffs made only conclusory allegations that the defendants "conspired and knew about the alleged plan to maintain Dentsply's market position." Howard Hess, 602 F.3d at 255. The complaint lacked specific factual allegations "plausibly suggesting a unity of purpose, a common design and understanding, or a meeting of the minds between and among" the defendants. Id. at 257. The Court rejected the plaintiffs' argument that the Court could infer a conspiracy from the defendants' "kn[o]w[ledge] that Dentsply was the dominant player in the artificial tooth market and because they all had an economic incentive to create and maintain [the existing] regime." Id. at 255. The plaintiffs' allegations established "'merely parallel conduct that could just as well be independent action,'" contrary to the Supreme Court's

holding in Twombly. Id. at 256 (quoting Twombly, 550 U.S. at 557).

Here, Mylan has not alleged a plausible conspiracy. Mylan has not pled any factual allegations concerning an agreement between Shionogi and CIMA. Although Mylan alleges that the Counter-Defendants were motivated "to delay and prevent generic competition in the relevant market," the allegations of how they "combined and conspired" are purely conclusory. Countercl. ¶ 57. Allegations that the Counter-Defendants had similar economic incentives to reduce competition, and a common awareness that the Proposed Product did not infringe the '341 patent, may establish parallel conduct but not conspiracy. See Twombly, 550 U.S. at 557; Howard Hess, 602 F.3d at 256.

In addition to the pleading deficiencies, Mylan does not state a claim for conspiracy or combination in restraint of trade because of the relationship between Shionogi and CIMA, an exclusive licensee and patent holder. In Copperweld, the Supreme Court held that a corporation and its wholly-owned subsidiaries could not conspire with each other as a matter of law, because they had a "complete unity of interest," rather than a "sudden joining of two independent sources of economic power previously pursuing separate interests." Copperweld, 467 U.S. at 771. The Court explained that "the broader principle [is] that substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." Copperweld, 467 U.S. at 773 n. 21. Applying this principle, district courts have held that other parties with unified interests, such as a patent holder and licensee, are incapable of conspiring. See Levi Case Co., Inc. v. ATS Prods., Inc., 788 F. Supp. 428, 431-32 (N.D. Cal. 1992) (Walker, J.) (holding that a patent owner and its exclusive licensee were incapable of conspiring as a matter of law). Moreover, as Counter-Defendants contend, CIMA may be a necessary party to an infringement

9

lawsuit by Shionogi. "As a general rule, 'a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights.'" Amgen, Inc. v. Ariad Pharm., Inc., 513 F. Supp. 2d 34, 41 (D. Del. 2007) (Thynge, M.J.) (quoting Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1347 (Fed. Cir. 2001)) (holding that under license agreement between patent holder and exclusive licensee, patentees were necessary but not indispensable parties to the litigation). Mylan's Section 1 claim must be dismissed for these reasons in addition to the inadequacy of the allegations under Twombly.

### B. Count Three: Sherman Act, Section 2

Section 2 of the Sherman Act provides for liability of "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2 (2010). "Liability under § 2 requires '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 306-07 (3d Cir. 2007) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). "Monopoly power is the ability to control prices and exclude competition in a given market." Id. at 307 (citing Grinnell, 384 U.S. at 570-71). A party may establish monopoly power by presenting "direct evidence of supracompetitive prices and restricted output," or by "infer[ence] from the structure and composition of the relevant market." Id. (citations omitted). Germane facts concerning monopoly power include having "a predominant share of the market," typically "a share significantly larger than 55%," "the size and

strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand." United States v. Dentsply Intern., Inc., 399 F.3d 181, 187 (3d Cir. 2005) (citations omitted). Courts will dismiss an antitrust claim where the complaint fails to plead the relevant product market. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) (affirming dismissal of monopoly claims for failure to plead a valid relevant market of "commodities reasonably interchangeable by consumers for the same purposes"). The Third Circuit defines the geographic market as "the area in which a potential buyer may rationally look for the goods or services he or she seeks." Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726-27 (3d Cir. 1991) (citations omitted) ("The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market.").

Here, Mylan's counterclaim is deficient with regard to allegations of monopoly power, the relevant geographic market, and the relevant product market. Mylan contends that its allegations that Shionogi and CIMA have an exclusive license agreement for the '341 patent and filed an infringement lawsuit to delay Mylan's entry to the market are sufficient to plead monopoly power. Countercl. ¶¶ 46-48. As Counter-Defendants rightly contend, however, the counterclaim must contain specific allegations of "proof of power in the relevant market," not a "mere presumption" based on ownership of a patent. Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 43 (2006). Mylan has not alleged germane facts from which market power may be inferred, identified in Dentsply Intern., 399 F.3d at 187. Mylan also makes wholly conclusory allegations that the relevant product market is "the market for treatment with orally disintegrating

11

prednisolone tablets." Countercl. ¶ 45. These allegations are not supported by facts showing a product market of reasonably interchangeable commodities from the perspective of the consumer, as required by Queen City Pizza, 124 F.3d at 436. Lastly, Mylan's allegation that the relevant geographic market is the United States, countercl. ¶ 45, is not accompanied by facts to explain why this is the appropriate market from the perspective of consumers and suppliers. These threadbare allegations are insufficient to satisfy the Twombly and Iqbal pleading standards. Therefore, Mylan has not stated a claim under Section 2 of the Sherman Act.

## VI. Conclusion

For the foregoing reasons, the Court will grant Counter-Defendants' Motion to Dismiss. Mylan is granted leave to amend its Complaint in conformity with this Memorandum within twenty-one (21) days. The Court reserves decision on all other grounds for dismissal until that time. An appropriate Order follows.

O:\DE Cases\10-1077 Shionogi v. Mylan\Shionogi v. Mylan MTD memo.wpd